**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

PATRICK SCANLON, *et al.*,

        *Petitioners,*

    v.

VERALEO, LLC,

        *Respondent*.

Civil Action No. 25 - 3915 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

In this action, Patrick Scanlon and John Colan (the Petitioners) seek confirmation of a $1,211,517.50 arbitral award issued against VerAleo, LLC, based on VerAleo's failure to pay them contractually required referral fees. During the arbitration proceedings, VerAleo argued that the Petitioners had themselves breached their referral contract by referring clients to companies other than VerAleo in violation of an exclusivity provision.

There are two disputes now before the Court. First, VerAleo moves to vacate the arbitral award, contending that the Petitioners improperly spoliated evidence and interfered with witness testimony related to the exclusivity-provision defense in arbitration. Second, the Petitioners filed a supplemental petition to obtain pre-judgment interest, which VerAleo opposes. For the reasons below, the Court denies VerAleo's motion, and it defers in part and denies in part the Petitioners' supplemental petition.

## BACKGROUND

### A.    Statutory Background

The Federal Arbitration Act (FAA) "authorizes parties to arbitration agreements to file specified actions in federal court," including "applications to confirm, vacate, or modify arbitral

awards." *Badgerow v. Walters*, 596 U.S. 1, 8 (2022). If a party timely applies "for an order confirming the award, . . . the court must grant such an order unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. And the FAA contemplates "expedited judicial review" of such applications. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008). Section 10 of the FAA, 9 U.S.C. § 10, "provide[s] the FAA's exclusive grounds for" vacatur. *Id.* at 584. Relevant here, a court may vacate an award when "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1).

### B. Factual Background

The Court draws the facts from the arbitrator's Award and Interim Award, as the Parties do not dispute those facts here. *See Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, No. 23-cv-680, 2024 WL 1071119, at *2–4 (D.D.C. Mar. 12, 2024) (using this approach), *aff'd* 141 F.4th 209 (D.C. Cir. 2025).

VerAleo is a tax advisory firm. *See* Interim Award at 4, ECF No. 1-3. During the COVID–19 pandemic, VerAleo offered services to help clients navigate requirements for the Employee Retention Credit (ERC), a refundable tax credit offered to qualifying businesses. *Id.* In 2022 and 2023, VerAleo and the Petitioners entered into contracts under which the Petitioners would receive 33% (later, 25%) of all resulting fees if they referred entities to VerAleo for ERC services. *Id.* at 4–5. Importantly, the Petitioners agreed "to an exclusive arrangement to use VerAleo to seek ERC Credits on behalf of [their] Potential Clients." *See id.*; Scanlon Referral Fee Agreement at 6, ECF No. 1-1. Under the contracts, breach of that exclusivity provision would void the Petitioners' entitlement to fees—and would require them to repay VerAleo all fees received to date. Interim Award at 4–5; Scanlon Referral Fee Agreement at 6.

In January 2024, the Petitioners filed a demand for arbitration with the American Arbitration Association alleging that VerAleo had failed to pay the referral fees that it owed them. Interim Award at 2. The arbitrator held a six-day evidentiary hearing on liability, bifurcating the issue of damages. *Id.* at 3. The arbitrator ultimately concluded that VerAleo had breached its contracts with the Petitioners by failing to pay owed referral fees. *Id.* at 10. She further determined that VerAleo had not proven that the Petitioners breached the contracts' exclusivity provision. *Id.* at 13. Although the Petitioners had "discussed amongst themselves and others referring ERC clients to providers other than VerAleo," the arbitrator found that VerAleo had "presented no evidence to establish that [the Petitioners] *actually referred* any clients to ERC providers other than to VerAleo." *Id.* After further proceedings on damages, the arbitrator awarded the Petitioners $714,411 in referral fees,[1] $400,425 in attorney fees, $56,544 in legal expenses, and $40,137.50 in arbitration fees—in total, $1,211,517.50. Award at 1, 11, ECF No. 1-2; Order at 1, ECF No. 17-3.

### C.      Procedural Background

In November 2025, the Petitioners filed a Petition to Confirm Arbitration Awards. ECF No. 1. VerAleo moved to dismiss the petition, and the Court denied that request. Mot. Dismiss, ECF No. 5; Order, ECF No. 11. VerAleo then moved to vacate the arbitral award. Mot. Vacate, ECF No. 12. Shortly after briefing on that motion concluded, the Petitioners filed a Supplemental Petition seeking prejudgment interest. Suppl. Pet., ECF No. 17. Because VerAleo's Motion to Vacate and the subsequent filings raised allegations of serious misconduct, the Court held an

---

[1] The arbitrator's October 2025 Award listed the amount as $717,411. Award at 11, ECF No. 1-2. But upon a motion by VerAleo, the arbitrator corrected the amount to $714,411 due to a clerical error. Order at 1, ECF No. 17-3. There is no dispute regarding this number. *See id.*; Suppl. Pet. 1, ECF No. 17.

evidentiary hearing. *See* Min. Entry (May 29, 2026). The Parties filed post-hearing briefs, and now both the Motion to Vacate and the Parties' dispute regarding the Supplemental Petition are fully briefed and ripe for review. *See* Mot. Vacate Opp'n, ECF No. 15; Mot. Vacate Reply, ECF No. 16; Suppl. Pet. Opp'n, ECF No. 19; Suppl. Pet. Reply, ECF No. 20; Pet'rs Post-Hr'g Br., ECF No. 29; VerAleo Post-Hr'g Br., ECF No. 28; Pet'rs Post-Hr'g Resp., ECF No. 30; VerAleo Post-Hr'g Resp., ECF No. 31.

## LEGAL STANDARD

"[J]udicial review of arbitral awards is extremely limited." *Kanuth v. Prescott, Ball & Turben, Inc.* 949 F.2d 1175, 1178 (D.C. Cir. 1991). "As a consequence, a party seeking to challenge an arbitrator's award under any of the FAA's limited grounds . . . 'must clear a high hurdle.'" *ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245, 253 (D.D.C. 2013) (quoting *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)). A "serious legal or factual error on the part of the arbitral Tribunal will not, standing alone, justify vacatur of an award." *Id.* "Instead, the FAA provides for vacatur of an arbitration award only in [the] four situations" listed in 9 U.S.C. § 10, *Petruss Media Grp. v. Advantage Sales & Mktg., LLC*, No. 22-cv-3278, 2023 WL 5507306, at *7 (D.D.C. Aug. 23, 2023), which include when an "award was procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1).

## DISCUSSION

The Court begins with VerAleo's Motion to Vacate and then turns to the Parties' dispute over the Supplemental Petition.

### A.     Motion to Vacate

VerAleo argues that the Court should vacate the arbitral award under 9 U.S.C. § 10(a)(1) because the Petitioners obtained it through fraud and undue means. *See* Mot. Vacate 1. "Although '§ 10(a)(1) has not been addressed in any detail by this Circuit,' other 'courts consistently refuse

to vacate an arbitral award under § 10(a)(1) unless the movant's submissions meet three cumulative conditions.'" *Metro. Mun. of Lima*, 2024 WL 1071119, at *12 (quoting *ARMA*, 961 F. Supp. 2d at 254).

"First, the party seeking vacatur must demonstrate by clear and convincing evidence that its opponent actually engaged in fraudulent conduct or used undue means during the course of the arbitration." *ARMA*, 961 F. Supp. 2d at 254. "[O]rdinary misconduct will not suffice; the alleged fraudulent acts must have been so prejudicial that they effectively denied the opposing party a 'fundamentally fair hearing.'" *Id.* (quoting *Hayne, Miller & Farni, Inc. v. Flume*, 888 F. Supp. 959, 952–53 (E.D. Wis. 1995)). "The 'undue means' component of § 10(a)(1) sets a similarly high bar, requiring 'nefarious intent or bad faith,' . . . or conduct that is 'immoral, if not illegal.'" *Id.* (first quoting *PaineWebber Grp., Inc. v. Zinsmeyer Trs. P'ship*, 187 F.3d 988, 993 (8th Cir. 1999); and then quoting *Conoco, Inc. v. Oil, Chem. & Atomic Workers Int'l Union*, 26 F. Supp. 2d 1310, 1320 (N.D. Okla. 1998)). "Conduct by an attorney that amounts to mere sloppy or overzealous lawyering does not constitute undue means." *Ray v. Chafetz*, 236 F. Supp. 3d 66, 76 (D.D.C. 2017) (cleaned up).

Second, "the movant must show that the fraud could not have been discovered before or during the arbitration through the exercise of reasonable diligence." *ARMA*, 961 F. Supp. 2d at 254.

And third, "'the alleged misconduct must materially relate to an issue in the arbitration,' which means '[t]he movant must demonstrate a causal connection between its opponent's conduct and the outcome of the arbitration.'" *Metro. Mun. of Lima*, 2024 WL 1071119, at *12 (quoting *ARMA*, 961 F. Supp. 2d at 254–55). "Courts in this District have also demanded proof that the

5

misconduct or fraud had some bearing on the arbitrator's final decision." *ARMA*, 961 F. Supp. 2d at 255 (collecting cases).

VerAleo contends that the Petitioners undermined the arbitral proceeding in two principal ways: (1) Mr. Scanlon deleted a text message favorable to VerAleo, and (2) the Petitioners and their counsel dissuaded one of their firm's employees, Abigail Reiman, from responding to VerAleo's arbitral subpoenas and testifying in the arbitration. VerAleo Post-Hr'g Br. 3, 5. The Court concludes that VerAleo has not carried its burden to vacate the award on either basis.

### 1.    Deleting the Text Message

The Court starts with the contention that Mr. Scanlon deleted a text message from Ms. Reiman's phone. First, a little background is necessary. Pierson Kreutzer was an employee of the Petitioners' firm, *see* Mot. Vacate Opp'n 4, and he knew that the firm had been "working on ERC referrals," Evidentiary Hr'g Tr. 13:20–21, ECF No. 32. While the arbitration was ongoing, Mr. Kreutzer asked Ms. Reiman if the firm was "still doing ERC stuff." *Id.* 13:20–23. When Ms. Reiman then asked Mr. Scanlon, he told Ms. Reiman—both "verbally and over text message"—that she should "have [Mr. Kreutzer] talk to Eric Little." *Id.* 13:23–14:4. At the time, Mr. Little offered tax services related to ERC credits. *See* Reiman Aff. ¶ 9, ECF No. 14.

At the evidentiary hearing, Ms. Reiman testified that she spoke with Mr. Scanlon at his house about her being a witness on behalf of the Petitioners at the arbitration. Evidentiary Hr'g Tr. 14:8–11. She told him that she "refuse[d] to lie on the witness stand and that, if [she] was going to be called as a witness, [she] was going to tell them that he had texted [her] about this." *Id.* 14:12–14. She said that Mr. Scanlon then took her phone and "deleted the text messages." *Id.* 14:15–20.

6

Mr. Scanlon also testified about this at the evidentiary hearing. He candidly admitted that "it's possible" that he discussed with Ms. Reiman "her telling Pierson Kreutzer to refer potential ERC clients to Eric Little's accounting firm." *Id.* 86:6–11. But he said that he "deleted nothing from Ms. Reiman's phone." *Id.* 86:5.[2]

The Court concludes that VerAleo has not provided "clear and convincing evidence" that Mr. Scanlon deleted a text message from Ms. Reiman's phone. *ARMA*, 961 F. Supp. 2d at 254. Having listened to Mr. Scanlon's testimony and observed his demeanor at the evidentiary hearing, the Court finds his testimony credible. Indeed, he forthrightly admitted an unfavorable fact: that it was possible that he had a conversation with Ms. Reiman about referring ERC clients to firms other than VerAleo.

VerAleo urges the Court to discredit Mr. Scanlon's testimony about such a conversation because he has been inconsistent about what happened. VerAleo Post-Hr'g Br. 4. But the record does not bear that out. At the evidentiary hearing, Mr. Scanlon testified that it was possible that he had that conversation with Ms. Reiman but could not recall it. *See* Evidentiary Hr'g Tr. 90:9–11 ("I think it's possible that that occurred, but I don't remember that specific discussion."); *id.* 91:1–9 ("Q. Did you discuss it with Ms. Reiman? A. Yes, yes. Q. Did you tell her that orally or via text message? A. Potentially both, but I don't -- I mean it was -- the message was conveyed. It could

---

[2] In its initial Motion to Vacate, VerAleo also referenced a text message from Mr. Scanlon to Ms. Reiman stating that "big ass nonprofits need to go to the little hornet." Mot. Vacate 5, ECF No. 12. In her affidavit, Ms. Reiman says that although she did not understand the text at the time, she "now understand[s] that statement to be a reference to sending entities to Mr. Little for ERC services instead of VerAleo." Reiman Aff. ¶ 10, ECF No. 14. At the evidentiary hearing, Ms. Reiman agreed that despite this statement, as far as she knew, "nothing ever transpired with Eric Little"—*i.e.*, that the Petitioners did not actually refer any potential client to Mr. Little. Evidentiary Hr'g Tr. 55:6–24, ECF No. 32. And more saliently, VerAleo does not contend that the Petitioners' conduct with respect to this text message amounted to fraud or undue means in the arbitration proceedings.

have been conveyed in both mediums. I don't want to trip myself up and say -- THE COURT: If you don't remember, just say you don't remember. THE WITNESS: I don't remember."). That is not inconsistent with his testimony at the arbitration hearing, when he said: "I don't remember. I don't think I did [have such a conversation with Ms. Reiman], but if there's a document to the contrary, then I stand corrected." VerAleo Post-Hr'g Br. 4. In short, Mr. Scanlon credibly testified that he did not delete the text message from Ms. Reiman's phone. Thus, Ms. Reiman's contrary testimony does not, without more, provide "clear and convincing evidence" that Mr. Scanlon indeed deleted the text message. *ARMA*, 961 F. Supp. 2d at 254. This does not provide a basis for the Court to vacate the arbitral award.

### 2.    Dissuading Ms. Reiman's Testimony

VerAleo next argues that the Court should vacate the arbitral award because the Petitioners and their attorney dissuaded Ms. Reiman from testifying at the arbitration. VerAleo Post-Hr'g Br. 5–8. It focuses on three episodes: (1) counsel for the Petitioners told Ms. Reiman that she did not need to engage with the arbitration, (2) the Petitioners told Ms. Reiman that she did not need to retain an attorney, and (3) Mr. Scanlon told Ms. Reiman that her sexual history could arise at the arbitration if she testified. But VerAleo again fails to prove that the Petitioners' conduct "denied [it] a 'fundamentally fair hearing.'" *ARMA*, 961 F. Supp. 2d at 254 (quoting *Hayne, Miller & Farni, Inc.*, 888 F. Supp. at 952–53).

*First*, VerAleo contends that counsel for the Petitioners improperly advised Ms. Reiman that she did not need to respond to arbitral subpoenas and that she should not communicate with VerAleo. VerAleo Post-Hr'g Br. 5. Ms. Reiman testified that after she was served subpoenas from the arbitrator, counsel for the Petitioners told her that she "didn't need to respond as third-party arbitration didn't have any authority to make [her] respond." Evidentiary Hr'g Tr. 23:16–20; *see*

8

*also id.* 21:17–21 (testifying that the Petitioners and their counsel "reiterated . . . that [she] did not need to respond to these subpoenas"). She also testified that when she received emails from an official at VerAleo, counsel for the Petitioners told her "what to respond" and eventually said that she could "stop responding." *Id.* 26:14–18. VerAleo argues that this constituted legal advice offered to an unrepresented person in violation of D.C. Rule of Professional Conduct 4.3(a)(1). D.C. R. Pro. Conduct 4.3(a) ("In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not[] . . . [g]ive advice to the unrepresented person other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client[.]").[3]

Even crediting Ms. Reiman's testimony, these events do not amount to more than "ordinary misconduct" and "will not suffice" to vacate the arbitral award. *ARMA*, 961 F. Supp. 2d at 254. VerAleo does not argue that counsel inaccurately described Ms. Reiman's legal obligations. *See* VerAleo Post-Hr'g Resp. 3–4. And importantly, it is clear from the record that Ms. Reiman herself had no interest in participating in the arbitration—meaning that counsel did not change her mind about what she should do or even pressure her to refrain from participating. *See, e.g.*, Evidentiary Hr'g Tr. 23:23–24 ("I didn't particularly want to be involved in this entire situation. It brought no benefit to me whatsoever."). So even assuming that it was inconsistent with the Rules of

---

[3] In Ms. Reiman's affidavit, she states that she did not authorize the Petitioners or their attorney to accept service of the arbitral subpoenas on her behalf. Reiman Aff. ¶ 12. In the Motion to Vacate, VerAleo suggests that this is another way that the Petitioners and their counsel sought to keep Ms. Reiman from testifying in the arbitration. Mot. Vacate 11. But at the evidentiary hearing, Ms. Reiman agreed that she had in fact told Mr. Colan that he could receive subpoenas for her. Evidentiary Hr'g Tr. 57:18–23. Mr. Colan concurred. *Id.* 76:1–3. That might be why VerAleo does not mention this issue in its post-hearing briefs.

Professional Conduct, counsel's conduct "d[id] not constitute undue means" sufficient to vacate the award. *Ray*, 236 F. Supp. 3d at 76 (cleaned up).[4]

*Second*, VerAleo avers that the Petitioners improperly told Ms. Reiman that she need not hire her own attorney to advise her about her participation in the arbitration. VerAleo Post-Hr'g Br. 7. It points to a text exchange between Ms. Reiman and Mr. Colan where Mr. Colan told Ms. Reiman that he had forwarded her VerAleo's subpoena, telling her that she could "talk to [Petitioners' counsel] about it of course." Reiman Aff., Ex. D at 1, ECF No. 14. She responded that "this is so inconvenient," that she did not "understand the subpoena," and that "now [she had] to hire an attorney." *Id.* at 2. Mr. Colan responded that she did not "have to hire an attorney." *Id.* In VerAleo's view, this also proves that the Petitioners employed "undue means to prevent Ms. Reiman from participating in the Arbitration." VerAleo Post-Hr'g Br. 7.

This, too, gets nowhere close to demonstrating that the Petitioners acted with "nefarious intent or bad faith," or that their conduct was "immoral, if not illegal." *ARMA*, 961 F. Supp. 2d at 254 (first quoting *PaineWebber Grp.*, 187 F.3d at 993; and then quoting *Conoco*, 26 F. Supp. 2d at 1320). VerAleo observes that despite his statement to Ms. Reiman, Mr. Colan told Mr. Kreutzer—who also received a subpoena—to "do whatever" Mr. Kreutzer's stepfather, an attorney, said. VerAleo Post-Hr'g Br. 7; Evidentiary Hr'g Tr. 77:15–18. Mr. Colan explained this difference at the hearing by noting that it was "easy" for Mr. Kreutzer to talk to his stepfather, whereas Ms. Reiman "was worried about the cost" of hiring an attorney and "stressed out about the situation in general," so he sought to "assuage her concerns on that and make her realize this [wasn't] that big of a deal." Evidentiary Hr'g Tr. 77:21–78:1. VerAleo suggests that this

---

[4] To be clear, the Court expresses no view about whether counsel's conduct was consistent with the D.C. Rules of Professional Conduct.

explanation was false and that Mr. Colan gave inconsistent advice because he wanted Mr. Kreutzer, and not Ms. Reiman, to testify at the arbitration. VerAleo Post-Hr'g Br. 7–8. But that supposition is a far cry from "clear and convincing evidence" that Mr. Colan acted as part of an underhanded scheme to keep Ms. Reiman from testifying. *ARMA*, 961 F. Supp. 2d at 254. And having observed his testimony at the evidentiary hearing, the Court credits Mr. Colan on this point.

*Third*, VerAleo argues that the Petitioners "threatened Ms. Reiman with humiliation if she testified at the Arbitration." VerAleo Post-Hr'g Br. 8. Ms. Reiman testified that Mr. Scanlon told her that her "sexual history was coming up" as part of the arbitration proceedings and that "there were intimate photos and videos of [her] that both sides, both parties, were seeing." Evidentiary Hr'g Tr. 24:7–15. Mr. Scanlon similarly testified that he told Ms. Reiman that he "thought there was a chance that VerAleo's counsel[] . . . would make an issue of the fact that she had been in the sex industry and it could perhaps undermine her attempts to enter a new industry." *Id.* 93:2–5. Although these remarks may have been inappropriate—and the record supports that Mr. Scanlon made sexist remarks about Ms. Reiman on several occasions, *see, e.g.*, *id.* 18:12–18, 24:16–24— the Court cannot say that VerAleo is correct to describe them as threats. VerAleo has not established that the effect of these comments was "so prejudicial that they effectively denied [it] a 'fundamentally fair hearing.'" *ARMA*, 961 F. Supp. 2d at 254 (quoting *Hayne, Miller & Farni, Inc.*, 888 F. Supp. at 952–53). In fact, the record establishes that Ms. Reiman had no interest in participating in the arbitration proceedings in the first place.

\*        \*        \*

Having heard the testimony and observed the demeanor of the witnesses and counsel at the evidentiary hearing, it is clear to the Court that there is bad blood on both sides of this dispute. The Court leaves out of this Memorandum Opinion the shots fired between counsel during questioning,

11

as they are unnecessary to resolve the narrow dispute currently before it. In the end, VerAleo has at most introduced evidence that the Petitioners made decisions and statements related to the arbitration that one might consider unwise. But that is not enough to "clear [the] high hurdle" required to vacate an arbitral award. *Id.* at 253 (quoting *Stolt–Nielsen S.A.*, 559 U.S. at 671). Because VerAleo has not met its burden to show that vacatur is warranted, this Court "must grant" the Petitioners' request for an order confirming the award. 9 U.S.C. § 9.[5]

### B.    Supplemental Petition

The Court turns to the Petitioners' Supplemental Petition. The Supplemental Petition appears to make two requests: (1) that the judgment include interest accruing between the issuance of the arbitral award and this Court's confirmation of that award (*i.e.*, post-award, pre-judgment interest); and (2) that the Court order pre-judgment interest for "any fees received by [VerAleo] to which [the Petitioners] are entitled under the damages award, but were not included in the" award. Suppl. Pet. 1–3. VerAleo opposes both requests. Suppl. Pet. Opp'n 1–2.

Start with the Petitioners' request for post-award, pre-judgment interest. "Where prejudgment interest is available, the question of whether to award it 'is subject to the discretion of the court and equitable considerations.'" *Cont'l Transfert Tech. Ltd. v. Fed. Gov't of Nigeria*,

---

[5] The Petitioners make much of the fact that Ms. Reiman only participated in these proceedings on VerAleo's side after VerAleo sued Ms. Reiman and then settled that lawsuit on confidential terms. Mot. Vacate Opp'n 8–9, ECF No. 15. They also point out that counsel for VerAleo played a substantial role in drafting the affidavit that is the centerpiece of VerAleo's motion. Pet'rs Post-Hr'g Br. 6–7, ECF No. 29. The Court agrees that the sequence of events leading to VerAleo's motion, and particularly Ms. Reiman's involvement, raises eyebrows. And the testimony elicited at the evidentiary hearing did not assuage the Court's concerns. But given that VerAleo cannot meet its burden on this record, the Court need not weigh in on Ms. Reiman's credibility or resolve the factual disagreements between the Parties regarding why Ms. Reiman participated in these proceedings.

932 F. Supp. 2d 153, 164 (D.D.C. 2013) (quoting *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997)). The Parties' arguments on this issue are puzzling.

VerAleo argues that the arbitral award constrains this Court's discretion to grant post-award, pre-judgment interest. Suppl. Pet. Opp'n 4–5. In the arbitral award, the arbitrator noted that the Petitioners had requested "pre-judgment interest," but she declined to award it because the Petitioners were not entitled to pre-judgment interest under Maryland law. Award at 10. VerAleo appears to acknowledge that by "pre-judgment interest," the arbitrator meant "pre-award interest." *See* Suppl. Pet. Opp'n 5; *see also* Suppl. Pet. Reply 2 (agreeing with this characterization). Yet VerAleo then seems to conflate pre-award interest with post-award, pre-judgment interest by arguing that granting such interest would be inconsistent with the arbitral award because the award "explicitly reject[ed] [the] Petitioners' request for pre-award interest." Suppl. Pet. Opp'n 5. At the same time, it recognizes that there is a distinction between the two, one that it argues "is irrelevant" (though it does not explain why). *Id.* At bottom, it is clear from the face of the arbitral award that the award's rejection of pre-award interest did not constitute rejection of post-award, pre-judgment interest.

In fact, another portion of the arbitral award might be read to address post-award, pre-judgment interest. After rejecting the Petitioners' request for "pre-judgment" (*i.e.*, pre-award) interest, the arbitrator turned to the Petitioners' request that the arbitral award "should direct [VerAleo] to pay [the Petitioners] referral fees once client fees are received for a particular invoice and . . . direct [VerAleo] to provide [the Petitioners] all future client invoices, plus post-judgment interest for the period from the entry of the Award until the date the Award is satisfied." Award 10–11. In response, the arbitrator said that "[t]he findings in the Interim Award speak for

13

themselves, without further elaboration." Award 11. She added: "Post-judgment interest will be governed by Maryland law, irrespective of this Award." *Id.*

Neither the Petitioners nor VerAleo say anything about this language. If—as the Parties appear to agree—the arbitrator used "pre-judgment interest" to refer to pre-award interest, then the award might be best understood as using "post-judgment interest" to refer to post-award interest. Yet the Petitioners say that post-award interest "was not addressed by the arbitrator," Suppl. Pet. Reply 2, and VerAleo compares this case to ones in which the arbitral award did not mention interest, Suppl. Pet. Opp'n 5.

What, then, to make of the arbitrator's statement that "[p]ost-judgment interest will be governed by Maryland law, irrespective of th[e] Award?" Award 11. Was she purporting to determine that a future tribunal enforcing the award must follow Maryland law when considering whether to award interest? Would such a determination be binding on this Court? *See Miminco, LLC v. Democratic Republic of the Congo*, 79 F. Supp. 3d 213, 218 (D.D.C. 2015) ("[T]his Court's decision to grant pre-judgment interest 'must be exercised in a manner consistent with the underlying arbitration award.'" (quoting *Cont'l Transfert Tech.*, 932 F. Supp. 2d at 163)); *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001) ("[Courts] 'do not sit to hear claims of factual or legal error by an arbitrator[.]'" (quoting *Kanuth*, 949 F.2d at 1178)). Was the arbitrator instead expressing that post-award, pre-judgment interest would be determined "irrespective of th[e] Award"—*i.e.*, that she intended the award to say nothing about such interest? And if such interest were consistent with the arbitral award, would that interest begin to run from the October 2025 award or the November 2025 modified award?[6]

---

[6] These questions also implicate VerAleo's argument that the Petitioners are effectively asking the Court to modify the arbitral award. Suppl. Pet. Opp'n 4, ECF No. 19. That argument might have force if the Petitioners are asking for something that the arbitrator considered and rejected. But as

Because the Parties do not address the relevant language in the arbitral award, the Court lacks a sufficient basis to determine whether it may award post-award, pre-judgment interest. It will thus defer resolving this portion of the Petitioners' Supplemental Petition. The Court will order the Parties to meet and confer by August 24, 2026, to determine whether the Parties can resolve this dispute without the Court's intervention. If they cannot, they must file a joint notice explaining their respective positions on this issue in no more than five pages per side.[7]

Next up is the Petitioners' rather strange request for pre-judgment interest for "any fees received by [VerAleo] to which [the Petitioners] are entitled under the damages award, but were not included in the" award. Suppl. Pet. 3. In other words, the Petitioners appear to request that this Court declare that they are entitled to post-award, pre-judgment interest on fees that they claim that they are owed but that were not the subject of arbitration. The Petitioners appear to be thinking specifically about certain client fees that VerAleo received after the close of evidence in the arbitration—the Petitioners believe that they are contractually entitled to a cut of these fees. *See* Suppl. Pet. Reply 3–4. And the Petitioners further request that this Court "direct [VerAleo] to provide" certain information about when it received client fees "so that the amount of post-award prejudgment interest can be properly calculated for all fee amounts due petitioners for ERC claims and invoices that were not paid before August 2025 but have since been paid and any that will be paid before the awards are confirmed." *Id.* at 4.

The problem is that the Petitioners provide no basis for the Court to do any of this. The Court's authority to confirm an arbitral award comes from 9 U.S.C. § 9. And the Petitioners

---

discussed above, it is unclear what, if anything, the arbitrator said about post-award, pre-judgment interest.

[7] To be clear, although the Petitioners' entitlement to post-award, pre-judgment interest has yet to be resolved, that stands as no obstacle to the Court confirming the fixed sum in the arbitral award and post-judgment interest. *See* Fed. R. Civ. P. 54(b).

15

provide no reason to conclude that Section 9 authorizes the Court to say anything about potential damages that an arbitrator did not award. The Petitioners may think that in light of the arbitrator's liability determination, it is abundantly clear that VerAleo owes them fees beyond those reflected in the arbitral award. But whether that is true is not a question for this arbitral-award-confirmation proceeding. The Petitioners identify nothing supporting that the Court can grant interest on fees that have yet to be reduced to an arbitral award (let alone a judgment) in this posture. The Court thus denies this part of the Supplemental Petition.

### CONCLUSION

For the foregoing reasons, the Court denies VerAleo's Motion to Vacate, ECF No. 12. The Court further defers in part and denies in part the Petitioners' Supplemental Petition, ECF No. 17.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    August 7, 2026

16